# EXHIBIT 1

## *PUBLIC REDACTED VERSION*

**AMERICAN ARBITRATION ASSOCIATION**

**COMMERCIAL ARBITRATION TRIBUNAL**

ENDOEVOLUTION, LLC,
Represented by Fish & Richardson P.C.

        Claimant,

v.

ETHICON ENDO-SURGERY, INC.,
Represented by Akin Gump Strauss Hauer
& Feld LLP

        Respondent.

Case No. 02-15-0006-0013

**HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

## AWARD

## I.    INTRODUCTION

Claimant EndoEvolution, LLC ("Endo") filed this arbitration proceeding against Ethicon Endo-Surgery, Inc. ("Ethicon"), alleging misappropriation of trade secrets, fraud, breach of contract, and breach of the covenant of good faith and fair dealing. These claims arise out of due diligence discussions leading to Ethicon's potential acquisition of Endo's suturing device for minimally invasive surgery ("MIS"). That device is called the Endo360°.

I, the undersigned Arbitrator having been designated in accordance with the arbitration agreement entered into between the above named parties and having been duly sworn, and having duly heard the allegations and proofs of the parties, enter this Award as follows: This arbitral tribunal has jurisdiction pursuant to the dispute resolution provisions of a July 18, 2011 document entitled "Secrecy Agreement," which provided that any disputes between the contracting parties that could not be resolved in mediation "shall be resolved by arbitration in

accordance with the Commercial Arbitration Rules of the AAA ("AAA Rules") . . . and the Federal Arbitration Act."  The dispute resolution provision further provided that:  (1) "The arbitration shall be conducted in Cincinnati, Ohio, by one arbitrator appointed in accordance with the AAA Rules;"  (2) "The arbitrator shall decide the Dispute in accordance with the substantive law of Delaware;" and (3) "The arbitrator may not award punitive or consequential damages, nor may the arbitrator apply any multiplier to any award of actual damages, except as may be required by statute."  Exhibit C-59.

In accordance with the arbitration provisions set out in the contract, an evidentiary hearing was held in Cincinnati, Ohio from May 8 through May 12, 2017.  The parties subsequently submitted post-hearing briefs, and the matter is now ripe for determination.

## II.   FACTUAL BACKGROUND

### A.   The Parties.

#### 1.   EndoEvolution.

Mr. Gerald ("Jerry") Brecher founded a company called SuturTek in the mid-1990s. Its successor entity, EndoEvolution, LLC, the Claimant in this case, was formed in 2009.  Along with his partner, John Meade, Mr. Brecher was one of the inventors of the Endo360° suturing device for minimally invasive surgery.  Endo's vision was to design an MIS device utilizing a curved needle that replicates a surgeon's natural hand stitching motion.  Mr. Meade had built various prototypes and devices over the course of a decade, culminating in the Endo360°.  The Endo360° was designed to be used in a variety of laparoscopic[1] surgical procedures, including bariatric and colorectal surgeries, gynecological operations, and mesh placement in hernia repair.

---

[1]  Laparoscopic surgery involves a surgical technique that minimizes incisions to reduce risk and tissue trauma.  The surgical procedure is typically performed with elongated devices that pass through a small incision in the body.

2.     <u>Ethicon Endo-Surgery.</u>

Ethicon Endo-Surgery, Inc., a Johnson & Johnson company, manufactures and develops

sutures and suturing devices to optimize patient care.  In early 2010, Ethicon initiated a

development program called "Project Stitch" to analyze a variety of suturing device concepts for

laparoscopic surgeries.  At that time, the leading suturing device for MIS surgery was a product

called Endo Stitch, manufactured and sold by Covidien.  Ethicon's objective was to develop an

MIS device that would compete successfully against Covidien's Endo Stitch.

**B.     Relationship Between the Parties.**

In April of 2008, SuturTek contacted Ethicon's parent company (Ethicon, Inc.) and sent

Ethicon, Inc. non-confidential materials describing its Endo360° device.  Mr. Brecher, then

president and CEO of SuturTek, arranged for Ethicon, Inc. to view the Endo360° in surgery.  He

subsequently loaned an Endo360° device to Ethicon, Inc., under no obligation of confidentiality,

for the purpose of performing animal surgery and testing.

Although Mr. Brecher had hoped to enter into a strategic relationship with Ethicon, Inc.,

no arrangement was ultimately consummated.  Mr. Brecher approached Ethicon, Inc. again in

October of 2008 to advise the company of further opportunities relating to the Endo360°.  On

that occasion, Mr. Brecher sent non-confidential materials including close-up pictures of the

Endo360° to Ethicon, Inc., which again declined to do business with SuturTek.

A few years later, in February 2011, one of the surgeon-advisers to SuturTek's successor

entity, EndoEvolution, approached Ethicon and arranged a meeting to be held on March 31, 2011

at the Society of American Gastrointestinal and Endoscopic Surgeons ("SAGES") conference in

San Antonio, Texas.  Endo saw this as a good opportunity to re-introduce its Endo360° to

another Ethicon entity.  Endo's advisor agreed that "[a] non-confidential meeting is fine being

that the device is patented."  Exhibit R-6.

A few months later, in June 2011, Dr. John Yacoub, another surgeon-adviser to Endo,

demonstrated the Endo360° to Jason Shields, who was then Ethicon's Manager of New Business

Development, Licensing and Acquisitions.

### C.     The Secrecy Agreement.

Following up on their inter-actions at the SAGES Conference, the parties arranged to

meet at Ethicon's headquarters on July 19, 2011 to talk further about the Endo360°.  In advance

of the meeting, the parties executed a Secrecy Agreement that covered Endo's "non-public

information related to development [of] and commercialization plans [for] endoscopic suturing

devices."  Paragraph 1 of the Secrecy Agreement used the term "Information" to cover all

"confidential information," which was defined to include "technical information, business

information, designs, data, analyses, compilations, studies, and the like."  Exhibit C-59.

Paragraph 6 of the Secrecy Agreement specified that Information would be deemed

confidential only if it was: "(i) disclosed in writing and indicated to be confidential by a

conspicuous marking or (ii) disclosed orally or in other non-written form, indicated to be

confidential at the time of disclosure and thereafter summarized in writing and indicated to be

confidential by a conspicuous marking and transmitted to the other party within 30 days of such

non-written disclosure."

Paragraph 10 of the Secrecy Agreement provided that Ethicon "has disclosed to [Endo]

that [Ethicon] and its affiliates presently have internal development programs relating to the

subject matter of the Information."  That paragraph further provided that Ethicon might

undertake such development programs in the future, emphasizing that any such development would be "without recourse to the Information disclosed hereunder."

Paragraph 2 of the Secrecy Agreement provided as follows:

> 2.    Duty of Recipient.  The receiving party agrees to keep the disclosing party's Information in confidence and not to disclose or use the disclosing party's Information (other than for the discussions) without the prior written consent of the disclosing party; provided, however, that nothing herein shall prevent the receiving party from disclosing the disclosing party's Information to directors, officers, employees, consultants or other representatives of the receiving party or the receiving party's affiliates (collectively, a party's "Representatives"), if such persons have a need to know such Information for the discussions and are subject to a confidentiality obligation with respect to such Information.  The parties agree that each will be fully responsible for any breach by its Representatives of their confidentiality obligations with respect to such Information.

Like most non-disclosure agreements, paragraph 4 of the Secrecy Agreement expressly stated that neither party had an obligation to maintain in confidence any information that "was known to the receiving party prior to being received from the disclosing party as evidenced by the receiving party's written records" or "is or without the fault of the receiving party (or any of its Representatives) becomes part of the public domain."  Exhibit C-59.

**D.    Ethicon's "Project Stitch."**

At the time that the Secrecy Agreement was executed, Ethicon had an ongoing R&D project (called "Project Stitch") to develop an MIS suturing device.  The Project Stitch team was working on developing a motorized Right Angle Suturing Device ("RASD").  The suturing head of the RASD was at a right angle to the shaft of the device.  The needle moved in a "reverse reset motion," meaning that the suturing needle moved in one direction and then reset by moving in the opposite direction.

### E.     The July 19, 2011 Meeting.

The purpose of the July 19, 2011 meeting at Ethicon's facility was to introduce the Endo360° device to additional representatives of Ethicon.  Endo's representatives attending the July 19th meeting included Mr. Dan Ryan, investor and Chairman of the Board of Endo, Mr. Jerry Brecher, Founder and CEO of Endo, Drs. Paresh Shah and Shawn Garber,  surgeon-advisors to Endo, and Erin Trigilio, Endo's Director of Product Marketing.  Ethicon's representatives attending the July 19 meeting included, among others, Mr. Jason Shields, Business Development, Mr. Carl Shurtleff, Marketing, and several R&D representatives, including Mr. Mike Cronin and Mr. David Martin. The agenda for the meeting was comprised of a general overview of the technology, value proposition, and market for suturing devices, as well as a hands on demonstration of Endo's suturing device in an animal model.   Exhibit R-2396.

Ethicon asserts that the July 19 meeting was intended to be an initial non-confidential overview, not a deep dive into Endo's confidential information.  However, Mr. Brecher testified that none of the Ethicon representatives advised him that they did not want to receive confidential information on July 19, and Mr. Brecher believes that confidential information was, in fact, discussed at the initial meeting.

As a result of the July 19 meeting, Ethicon initiated "Project Paradigm," which was the company's code name for its due diligence evaluation of EndoEvolution for the purpose of a potential acquisition of the Endo360°and related assets.

### F.     Sharing Information.

In accordance with the express terms of the Secrecy Agreement, Mr. Brecher understood and explained to Endo's primary investor, Mr. Ryan, that confidential documents had to be so marked in order to be treated as confidential Information under the Secrecy Agreement.  In an

email dated September 29, 2011, Mr. Brecher advised Mr. Ryan: "The NDA also clearly states that in order to be covered by the NDA it has to be conspicuously marked as confidential." Exhibit 4091.

When Mr. Brecher sent confidential information, conspicuously marked, to Ethicon's Jason Shields in September 2011, Mr. Shields responded that he did not want to share the information with Ethicon's R&D team. *Id.* Mr. Brecher replied that Ethicon was free to share any of Endo's information with its employees internally. In particular, he said: "What the legend on the document means is that this information is covered under the terms of our confidentiality agreement, which of course entitles you to share this information internally. You certainly have our consent to share this with your team." *Id.* Mr. Brecher's interpretation of the contract is entirely consistent with the express terms of paragraph 2 of the Secrecy Agreement. However, Ethicon's in-house counsel, Victor Moreno, contacted Mr. Brecher to explain that, since Ethicon was developing a similar type of MIS suturing device, Ethicon did not want to taint its research and development team by sharing any confidential information with it, especially before Ethicon had made a decision whether to move to the next stage of the due diligence process, at which confidential information would need to be exchanged. *Id.* Mr. Brecher agreed to comply with Ethicon's request.

**G.      Ethicon Sets Up a "Clean Team."**



██████████████████████████████████████████████████

████████████ Ethicon's counsel emphasized at the hearing that the Secrecy Agreement did not

*require* it to create a Clean Team or to firewall its research and development team.  Ethicon's

interpretation of the Secrecy Agreement is correct, with the caveat that paragraph 10 of the

contract precluded Ethicon from *using* Endo's confidential Information in Ethicon's own internal

development programs "relating to the subject matter of the Information."  Exhibit C-59, ¶ 10.

### H.    Voice of Customer Testing.



In October 2011, Endo agreed to provide Ethicon with an Endo360° to use in a planned

"Voice of the Customer" ("VOC") test that Ethicon had arranged for late October, 2011.  One of

the critical issues in this case is whether Ethicon's subsequent use of the Endo360° device

violated Ethicon's obligations under the Secrecy Agreement.  Ethicon contends that the

Endo360° device was in the public domain.  Endo argues, to the contrary, that, while the device

may have been used by surgeons in appropriate testing of the reliability of the device and studied

by Harvard medical professionals in connection with their medical analyses, such uses were

limited and did not constitute public availability of  the device, particularly since the Endo360°

was still a prototype and was not sold commercially until June of 2012.

---

[2]   Endo's 2011 marketing literature stated that: "The Endo360° minimally-invasive suturing device is covered by one or more of the following US Patent Nos 5,437,681, 5,540,705, 6,923,819, and 7,882,572."  C-452.

In support of its contention that the Endo360° device was itself confidential Endo relies heavily on an October 12, 2011 email from Jason Shields to Dan Ryan.  In that email regarding the VOC study, Mr. Shields states at the outset: "Your support in enabling our collection of VOC from surgeons is critical.  Additionally, your confidence in our approach and trust that we are treating you [sic] devices as we would treat our own is important." After delineating the market research protocol for the VOC study, Mr. Shields concludes the email by stating:  "The sharing of devices would be covered under our existing NDA.  Alternatively, [we] would [sic] could sign a bailment agreement if you would prefer.  Any unused suture we have left over, we would be happy to return."  Exhibit C-69.  Mr. Ryan testified that he interpreted the October 12th email to be Ethicon's acknowledgement that the Endo360° device was confidential Information under the NDA.

Mr. Shields testified that he simply wanted to assure Endo in the October 12, 2011 email that the devices would be returned to Endo at the conclusion of the study in light of the limited number of those devices that Endo had available.  For that reason, he offered to sign a bailment agreement.  Ethicon further argues that it was not Ethicon's burden, but rather Endo's responsibility under paragraph 6 of the Secrecy Agreement, to affirmatively designate the device as confidential by so indicating orally at the time of its disclosure and thereafter, within 30 days of the disclosure, summarizing it in writing with a conspicuous marking.  Ethicon contends that the unambiguous language of paragraph 6 of the Secrecy Agreement *required* Endo to clearly designate the device as confidential "Information."  Ethicon also argues that one sentence in an email from Mr. Shields is not a valid contractual basis for Endo to claim the Endo360° was confidential Information under the terms of the Secrecy Agreement.

The parties further dispute the scope of and consent for the VOC study.  Mr. Shields testified that Endo consented to the study.  The VOC study was a market evaluation designed to test surgeons' assessment of Covidien's Endo Stitch, when compared with Ethicon's prototype Right Angle Suturing Device ("RASD") and the Endo360°.

Endo's witnesses testified that they were aware of and assisted with the VOC study, but that they did not know that Ethicon was comparing its own prototype device with Endo's Endo360° in that market test.  Ethicon points to an email in which Mr. Brecher appears to acknowledge that such a comparison would be done, although the email does not indicate that such a comparison would be done *in the VOC study*.  Exhibit R-4202 (July 31, 2011 email from Jerry Brecher to Stuart Diamond stating: "They [Ethicon] say they want to compare our technology to whatever they have cooking in their shop.")

Ultimately, the VOC study revealed that surgeons preferred the in-line forward reset[3] architecture of the Endo360°.  Endo asserts that, as a result of the market study, Ethicon decided to abandon its RASD program, thereby benefitting Ethicon's internal development of an MIS suturing device, giving Ethicon an improper (and legally actionable) head start.  In contrast, Ethicon's witnesses testified that, as a result of the surgeons' documented preference for the in-line architecture as well as budgeting constraints, Ethicon made a decision to stop pursuing development of the RASD device and to concentrate instead on an in-depth analysis of the Endo360° in the hopes of consummating an acquisition of Endo's assets.

---

[3]    The suturing head is "in-line" when it is positioned at a zero angle relative to the shaft of the suturing device.  A "forward reset" motion means that the needle only moves in one direction around a circle.

## I.      Ethicon's Due Diligence Trip to Massachusetts

Ethicon's Clean Team was responsible for reviewing confidential Information provided by Endo.  Prior to making a trip to Endo's offices in late November 2011, ███████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

███████████████████████ Exhibit R-73.  ███████

████████████████████████████ ████████ since

Ethicon considered the device to be in the public domain.

████████████████████████████████████████

████████████████████████████████████

████████████████████████████.  At Endo's

Massachusetts facility, ███████████████████████

████████████████████ The Clean Team prepared an

assessment and report of its findings.

Ethicon ████████████████████████████

████████████████████ ████████████████████

████████████ In an email dated January 6, 2012 addressed to Dan Ryan, Jason

Shields stated that ███████████████████████████

████████████████████ C- 453.

### J.        January 2012 Non-Destructive Testing of the Endo360°

In the January 6, 2012 email, Mr. Shields sought permission from Endo to perform non-destructive testing of an Endo360° device.  His email stated:  "We plan to do some engineering analysis to better characterize the risk.  To facilitate this work, we plan to do some non-destructive testing on the prototype you have loaned us.  To be clear, we do not plan to disassemble or damage the device."  C-453.  Upon receipt of the email from Mr. Shields, Mr. Ryan sent an email to Mr. Brecher saying: "I think I should tell him we would like to review the test plan."

The parties vigorously dispute whether permission for non-destructive testing was ever given.  Mr. Ryan acknowledged that a simple ▮▮▮ of the device was okay.  In an email he sent to Ms. Erin Trugilio, Endo's Director of Product Marketing, Mr. Ryan commented:  "Jason said they did take the desired ▮▮▮ of the device to better understand how the parts interact in operation.  I'm fine with their having done so but glad we caught it before they went further, including sending it for sterilization evaluation."  Exhibit C-457.

 Mr. Ryan emphasized that he had no idea that Ethicon's Project Stitch team would be undertaking ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of what he considered to be trade secrets embodied in the Endo360° device.  He learned about it for the first time during the course of discovery in this arbitration.  Mr. Brecher and Mr. Ryan both testified that they would never have allowed a competitor to perform an engineering analysis, generating detailed measurements and engineering models of the Endo360° that could be used in developing a competing product.

However, Ethicon's witnesses, including Mr. Mike Cronin, Mr. Dave Martin, and Mr. Jason Shields, testified that the device itself was not confidential and that the comprehensive non-destructive testing of the device was undertaken solely for purposes of evaluating the

12

technology as part of Project Paradigm's due diligence assessment.  Moreover, Mr. Shields

believed that Endo had approved the non-destructive testing that he had requested.

Exhibit C-304.

### K.      Ethicon's "Concept and Use" Testing in February 2012

Ethicon and Endo agreed that Ethicon would undertake Concept and Use testing, utilizing

six Endo360° devices.  The C&U tests involved numerous surgeons assessing the Endo360°

device in several cities throughout the United States and in other countries.  Although the

concept of the device received positive feedback, ███████████████████████████████

█████ █████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ ███████████████████████████████.

### L.      Negotiations for Acquisition of the Endo360°

After assessing the value of the acquisition, in May of 2012 Ethicon's President sent a

memo to management requesting approval to negotiate the acquisition of Endo's assets ████

███████████████████████████████████████████████

██████████████████████████████  Exhibit R-3372.  After receiving approval, Ethicon

made an offer to acquire Endo's assets for ████████████████████████████████████

Endo rejected that offer and indicated that it had valued the Endo360 and related assets at over

███████████████████████████████████████████████████████████

█████████████████████████  Although negotiations formally ended at that point,

Ethicon left the door open for Endo to reconsider its position.  Mr. Brecher subsequently reached

out to Ethicon in October of 2012 in order to reopen negotiations.  In an email dated October 6,

2012, Mr. Brecher indicated a willingness to sell Endo's assets for ███████████████ and

additional financial benefits.  Exhibit R-2435.  But, by that point in time, Ethicon was no longer

interested.  In an email dated November 16, 2012, Mr. Alan Rae, Ethicon's Vice President for

New Business Development, advised the management team that he had informed Mr. Brecher

that Ethicon "would not commercialize their current device and therefore could no longer

support a valuation for their technology that would be acceptable to them."  Exhibit R-2442.

Ethicon officially terminated Project Paradigm.

### M.    Development of ProxiSure

After the negotiations to acquire the Endo360° had failed, Ethicon reinstated Project

Stitch.  Ethicon's engineering team considered both in-line and perpendicular architectures as

well as a variety of different needle systems and different drive mechanisms.  The development

work continued for several years at a ███████████████████████████████ Mr.

Martin, Ethicon's Principle Design Engineer, testified that, during the time period from May

2011 to December 2016, the development work was documented in approximately 370 Ethicon

engineering studies, referred to as protocol completion reports or "PRCs".  Most of the

development work began in early 2013 and was fully completed a few months prior to the time

Ethicon officially launched its ProxiSure product in March of 2017.

### N.    Trade Secrets

Endo's witnesses, particularly its expert technical witness, Mr. Michael Plishka, testified

that the Endo360° contained significant trade secrets.  These trade secrets included: ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████.  Endo argues that Ethicon learned these trade secrets through the due diligence process.

Endo alleges that Ethicon later incorporated these key features of the Endo360° in its ProxiSure device, thereby misappropriating Endo's trade secrets and breaching the Secrecy Agreement.  In support of its allegation, Endo contends that it was blindsided by Ethicon's use of the Project Stitch team to undertake a deep dive into the technical issues, including undertaking ████████████████████████████████ of the suturing device.  Endo alleges that Project Stitch obtained a detailed assessment of the innovative features of the Endo360°, which gave Ethicon an improper head start in developing the ProxiSure.

Ethicon's witnesses testified that the ProxiSure was independently developed and did not rely in any way on the due diligence information that the company developed when it examined the strengths and weaknesses of the Endo360° in connection with its potential acquisition of Endo's assets.

## III.   LEGAL CLAIMS AND DEFENSES

### A.   Endo's Legal Claims

Endo asserts that the ProxiSure has many of the key features and dimensions of the Endo360°.  Both devices are reusable.  Both use disposable needle cartridges with circular needles and trailing suture attached to the end of the needle.  Specifically, Endo claims that Ethicon misappropriated four of Endo's trade secrets.  In addition, Endo claims that Ethicon breached paragraph 10 of the Secrecy Agreement, which precluded Ethicon from utilizing confidential Information in developing a competing device.

Endo also alleges that Ethicon committed fraud.  In support of that claim, Endo points to Jason Shield's October 12, 2011 email in which he assured Endo that the device would be

"covered under the NDA" even while he believed that the device was in the public domain and not confidential.  Endo alleges that it relied on Ethicon's reassuring statements while being deceived by the allegedly clandestine activities undertaken by Ethicon's research and development team to analyze the device in detail and utilize that analysis to facilitate its own development efforts in ProxiSure.

In summary, Endo's claims revolve around the theme that Ethicon's due diligence activities utilized Endo's confidential information for its own internal product development.  According to Endo, in the process of developing ProxiSure, Ethicon misappropriated Endo's trade secrets, breached the Secrecy Agreement, and committed fraud.

### B.     Ethicon's Response to Endo's Claims

Ethicon argues that Endo has failed to meet its burden of proof on any of the claims.  First, Ethicon contends that there were no trade secrets in the Endo360° device. To the contrary, many people had unrestricted access to the device for many years before the parties had entered into the Secrecy Agreement.

Second, Ethicon contends that it did not breach the contract.  Ethicon points to Endo's claim that the key issue in the case is whether the Endo360° device itself was confidential "Information" under the Secrecy Agreement.  Ethicon emphatically denies that the device was confidential "Information" because the clear requirements of the contractual provisions were never met.  In particular, Ethicon contends that Endo never complied with paragraph 6 of the Secrecy Agreement, which required Endo to indicate by conspicuous marking and advise Ethicon in writing, within 30 days of disclosure, that it considered the device to constitute confidential "Information" in accordance with the express terms of the contract.

Finally, Ethicon asserts that there was no evidence of fraud.  Ethicon argues that the fraud claim is merely another way of attempting to assert breach of contract by claiming that Ethicon allegedly *knew* in advance that it was planning to violate its contractual commitments.

## IV.   LEGAL ANALYSIS

### A.   Trade Secrets Claim

Under the Secrecy Agreement, Delaware law is controlling.  The Delaware Uniform Trade Secrets Law defines a trade secret as:

> "Information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a.      Derives independent value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> b.      Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Del. Code Ann. Title 6, Sections 2001(4)(a)-(b).

Endo's expert witness, Mr. Plishka, described Endo's alleged trade secrets in some detail. For example, the alleged trade secrets embodied in the ███████████████████ ████████ were designed to ensure that the needle properly aligns with the track and guides the suture without stoppage or breakage.  ████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████. Mr. Plishka testified that these trade secrets provide Endo with a competitive advantage because they enable a surgeon's instrument to "bite" the proper amount of the tissue.  Dr. Shaw testified that Endo developed these trade secrets after evaluating several different curved needle configurations and after receiving critical feedback from surgeons who had utilized prototypes of the device.

Endo also claims ███████████████████████████████████

███████████████████████████████████████████████████████

Dr. Stowers testified said that this is a critical feature that increases patient safety during surgery and offers a significant improvement over Covidien's Endo Stitch.

Endo's expert witness, Mr. Plishka, and its CEO, Mr. Brecher, both testified that these trade secrets were developed over a long period of time in a workshop that was under lock and key and that all of the engineering data regarding this technology was kept on highly secure servers.

Mr. Brecher testified that Endo only loaned the device when there was an implied or express duty of confidentiality.  He emphasized that the Endo360° was loaned solely for limited purposes, none of which would, in his view, have revealed the trade secrets.  For example, Dr. Shaw testified that the device was loaned to him only to be used in surgical procedures. Ethicon's Mike Cronin testified in cross-examination that surgeons "don't have the equipment or know-how" to perform technical measurements of an MIS device because surgeons are not trained engineers.

Endo often required those to whom it loaned the Endo360° device to sign an NDA.  But it did not do so in all instances.  In fact, as Ethicon emphasized at the hearing, Endo had loaned an Endo360° device to Mr. Gooding of Ethicon Inc. in 2008 without any written NDA or other express confidentiality obligation.

Nevertheless, Endo contends in its briefs that trade secret law does not require a signed NDA.  *See Savor Inc. v. FMR Corp.,* 2004 WL 1965869 (Del. Sup. Ct. August 16, 2004).  Endo argues that, although its devices were disclosed to the public at trade shows, the attendees could not discern the precise measurements of the needle or reentry structures with the naked eye.  Mr.

Brecher testified that Endo did not permit visitors to its booth to take detailed measurements at trade shows.  Mr. Cronin testified on cross-examination that it would be unethical for a visitor, especially a competitor, to go up to Endo's trade booth and perform tests on the device.  Endo alleges that Ethicon only learned of the trade secrets during its due diligence, not through any prior public disclosures.

In order for Endo to prevail on its trade secrets claim, it must establish that the Endo360° device contained trade secrets and that Endo protected those trade secrets from disclosure. Specifically, Endo "must show the existence of a trade secret with [a] reasonable degree of precision and specificity . . . This identification must be particular enough as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade." *Dow Chem.Can. v. HRD Corp.,* 909 F. Supp.2d 340, 346 (D. Del. 2012).

Under Delaware law "misappropriation" of a trade secret is the unauthorized use or disclosure of a trade secret of another without express or implied consent. Del. Code Ann. Tit. 6, §2001(2).  Endo alleges that Ethicon misappropriated its trade secrets by using them as a guide and a springboard to solving technological problems in the development of the ProxiSure. Endo's expert witness, Mr. Plishka, testified that the ProxiSure contains ███████████████████████████████████████████████████████; that the ProxiSure incorporates Endo's trade secrets ████████████████████████████████████████████████████████████████ and that the ProxiSure contains ████████████████████████████████ ████████████████

In its post-hearing brief, Ethicon emphasized Endo's inability to prove any of the elements of trade secrets misappropriation by a preponderance of the evidence, as required under Delaware law. *Elenza Inc. v. Alcon Labs Holding Corp.*, C.A. No. N14 C-03-185 MMJCCLD

2015 Del. Super. LEXIS 152 at *9 (Del. Super. Ct. Mar. 11, 2015). The four elements of proof

include: (1) that a trade secret exists; (2) that plaintiff communicated the trade secret to

defendant; (3) that the communication was made under an express or implied understanding that

the secrecy would be protected; and (4) that the trade secret was used or disclosed improperly to

plaintiff's detriment.

Ethicon's fact and expert witnesses testified persuasively that Endo's alleged trade

secrets were known and/or readily understood by others in the industry. The technological

aspects of its device were not secret. Ethicon's witnesses also testified that Endo did not

exercise reasonable care to safeguard the alleged trade secrets. In particular, Endo disclosed in

its public patent filings the features that it now maintains are secret. These include ██████

████████████████████████████████████████████████████████

████████████████. Information that is disclosed in a patent cannot be a trade secret.

*Atl. Research Mktg. Sys. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011).

In addition to the public disclosures in its patent filings, Endo also posted videos of the

Endo360° on its public website. Ethicon's technical expert witness, Mr. Leinsing, testified that

the website videos "show everything about the device in terms of its operation," including the

██████████████. In addition, Endo loaned the Endo360° to dozens of surgeons as well

as medical device manufacturers, with no obligation of confidentiality, during the time period

from 2009 through its first commercial sale in June of 2012. Further, Harvard physicians who

authored and published an article about the device had the Endo360° in their possession for

13 months, without an NDA. They took videos and photographs of the device which appeared in

the article they wrote about it. Endo shipped one of its Endo360° devices to ██████████

████████████████████████ September of 2008. Endo sent an Endo360° to

██████ to a company called ██████ in September of 2008.  Endo displayed the Endo360°

device at several trade shows between 2008 and 2011.  Endo demonstrated an Endo360° device

to a representative from ██████ in October of 2010.  Endo permitted two sales

representatives from █████, a competitive medical device manufacturer, to view the

Endo360° in surgery in the Spring of 2011.

Endo argued that the trade shows and use of the device to further medical research and

public safety would not have exposed the alleged trade secrets because they were not visible to

the naked eye.  Ethicon's rejoinder is that these alleged secrets are easily measured dimensions

or well-known principles in medical device design.  Moreover, Ethicon's parent company,

Ethicon Inc., had been loaned the device in 2008 with no NDA.  Mr. Gooding of Ethicon

testified that he did not consider the device to be confidential.  Mr. Brecher admitted on cross-

examination that he did not believe the device he had given to Ethicon Inc. in 2008 was

confidential.

Ethicon contends that Endo has failed to prove that the Endo360° embodied trade secrets

and that Endo adequately protected the confidential information that it now claims to be trade

secrets.  Endo also failed to prove that Ethicon misappropriated any alleged trade secrets by

incorporating them in the ProxiSure device.  Endo acknowledged in its pre-hearing brief that the

Endo360° and ProxiSure are different in significant ways.[4]  More importantly, Ethicon's

witnesses demonstrated that the devices have ████████████████████

████████████████████████████████████

████████████████████ Ethicon also emphasized that the

---

[4]  Endo claims that the Endo360° is superior to the ProxiSure and that it provides users with
benefits over Ethicon's device.

ProxiSure ███████████████████████████████████████████████

that is an important aspect of the Endo360°.

Ethicon's witnesses, Mr. David Martin, the lead designer for Project Stitch, and Mr. Mike Cronin, Ethicon's R&D project director, testified persuasively that the ProxiSure was developed independently of any confidential information gleaned from due diligence conducted on the Endo360°.   Their multi-year efforts are documented in hundreds of written reports called PRCs.

While Endo's allegation has initial appeal – *i.e.,* that Ethicon's research and development team (Project Stitch) acted without authorization when they made ██████████ of the Endo360° and ███████████████████████████ – the problem with the argument is that Endo failed to prove that the Endo360° contained any trade secrets or that the ProxiSure device actually incorporates the alleged trade secrets in the Endo360°.

After listening to the parties' testimony over the course of a week and reviewing the admitted exhibits and salient case law, I conclude that Endo has failed to prove the existence of any bona fide trade secrets and that it has further failed to prove that Ethicon actually misappropriated the precise features that Endo claims as trade secrets.  Having reached that conclusion, I do not need to address Endo's damage claim for misappropriation of trade secrets.

## B.    Breach of Contract Claim

Endo's breach of contract claim is based, in large part, on the October 12, 2011 email from Jason Shields of Ethicon to Dan Ryan, Chairman of the Board of Endo.  In that email Mr. Shields stated: "The sharing of devices would be covered under our existing NDA."  C-69.  Mr. Ryan and Mr. Brecher testified that they interpreted the email to mean that the Endo360° would be treated confidentially in accordance with the Secrecy Agreement.

Endo's argument essentially attempts to rewrite the Secrecy Agreement because it conflicts with the plain and unambiguous text of the contract.  Paragraph 14 of the contract prohibits modification except when "made in writing and signed by both parties."  C-59 at ¶ 14. In *Convolve v. Compaq Computer Corp,* 527 F. Appx. 910, 914-915, 923-924, *rev'd in part on other grounds,* 812 F.3d 1313 (Fed. Cir. 2016), as in the present dispute, the parties had entered into an NDA that required them to mark confidential information at the time of disclosure or, in the case of an oral disclosure, to designate the information as confidential at the time of disclosure and follow up by a written memorandum within 20 days clearly providing notice of what specific information was confidential.  The plaintiff in that case argued that the parties had waived the written confidentiality requirement by their course of conduct, *i.e.* the testimony of one witness that he believed all disclosures were confidential.  The court held that "the subjective intent of one of the parties is not indicative of the mutual intent of both parties."  *id.* at 923-924. That analysis is equally applicable here, particularly in light of paragraph 14 of the contract, which prohibited any modifications unless made in writing signed by both parties.

Endo further contends that use of the Endo360° device for competitive market research in October of 2011 breached the express terms of the contract as well as the implied covenant of good faith and fair dealing.  However, Mr. Brecher had previously acknowledged to Mr. Ryan that he understood that Ethicon intended to compare the Endo360° with "whatever they have cooking in their shop."  R-4091.

Endo also argues that the VOC study was undertaken to benefit Ethicon's product development, not its due diligence.  In support of that contention, Endo points to Ethicon's description of successful results achieved by the Endo360° device in the October 2011 VOC comparative market study and improper  attribution of that success to Ethicon's *own* Project

Stitch development efforts when the Project Stitch team reported its results to management. *See* Exhibits C-83 and C-103.

Endo also alleges that Ethicon improperly utilized confidential Information gleaned from the VOC market study.  In support of that allegation, Endo relies on the fact that immediately after the VOC test Ethicon abandoned any further development of its prototype RASD device. However, Ethicon's witnesses and the exhibits introduced at the hearing demonstrated that Ethicon made a decision to stop pursuing the RASD device because of budgetary constraints. Ethicon's decision was based on its intention to pursue the acquisition of the Endo360°, rather than further internal development of the RASD.

Endo further argues that the project Stitch Team's subsequent non-destructive testing of the Endo360° device breached the express and implied provisions of the contract.  But Mr. Brecher had himself acknowledged that the Secrecy Agreement entitled Ethicon to share any of Endo's confidential Information with Ethicon's directors, officers, employees, and consultants. Exhibit R-4091.

The Threshold issue is whether the Endo360° device was or was not confidential Information.  The contract precluded Ethicon from resorting to *confidential* Information in developing its own product.  It did not preclude Ethicon from utilizing public information, such as patents, website videos, published articles, and similar non-confidential information.

At the due diligence meeting in Massachusetts in late November of 2011, Ethicon's Clean Team did have access to and review Information that was indisputably confidential. Notably, there is no allegation – and no evidence – that the Clean Team shared any of the Information that it received from Endo during the due diligence meeting at Endo's facility in

Massachusetts with any member of the Project Stitch team or that the Project Stitch team utilized such information in developing the ProxiSure.

The legal predicate for a breach of contract claim is dependent upon Ethicon's breach of the language within paragraph 10 that precludes Ethicon from *using* confidential Information to undertake its own internal development "relating to the subject matter of the Information." C-59.   The evidence does not support the allegation that the design of the ProxiSure was based on ███████████████████████████████ of the Endo360° device.  To the contrary, it took Ethicon several *years* of research, design, and development efforts, as well as ███████████████, to produce the ProxiSure device.

The evidence adduced at the hearing established that the Project Stitch team's technical evaluation was undertaken to advise Ethicon's acquisition team of the additional development work that would need to be done – and the concomitant cost of any such work.  This analysis provided important data for the company's decision makers to consider in determining an appropriate price for the acquisition.   There was insufficient  evidence to substantiate Endo's claim that the technical analysis of the device was performed for the purpose of aiding Ethicon's own internal development.  The fact that negotiations for the acquisition ultimately failed does not, by itself, lead to the conclusion that Ethicon had a prior improper purpose.

Moreover, the fact that Ethicon subsequently decided to develop an in-line forward-reset suturing device (the ProxiSure) does not confirm that it was somehow copying the architectural design of the Endo360° for  three reasons.  First, use of an in-line forward-resetting architecture on a suturing device was public information.  Second, according to Mr. Cronin's testimony and Exhibits C-93 and C-66, Ethicon had previously developed an internal in-line forward-reset suturing device under the code name "Spiderman."  Third, Exhibit C-66 (dated November 3,

2011) confirms that Ethicon had intended to revisit all previously considered internal concepts, including Spiderman and RASD, in the event that the acquisition of Endo failed.

Because Endo did not bear its burden of proving the use of Endo's confidential Information in developing the ProxiSure, I cannot conclude that Ethicon breached the Secrecy Agreement.

### C.      Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Endo also argues that Ethicon breached the implied covenant of good faith and fair dealing, which is embodied in every contract under Delaware law.  *Dunlap v. State Farm Fire and Casualty Co.*, 878 A.2d 434, 441-442 (Del. 2005).  (A party is liable for a breach of the implied covenant of good faith and fair dealing when its conduct frustrates the contract's overarching purpose.)  Endo contends that Ethicon's conduct frustrated the purpose of the Secrecy Agreement.  In particular, Endo alleges that Ethicon used the confidential Information in the Endo360° device in a secretive manner to initiate and guide its own internal development efforts rather than as due diligence for the acquisition.  If the facts substantiated this allegation, the conclusion would not only be a breach of the implied covenant of good faith and fair dealing, it would also be a breach of the express terms of paragraph 10 of the Secrecy Agreement.  Unfortunately for Endo, the evidence does not bear out the allegation.

In order to establish breach of the implied covenant of good faith and fair dealing, Endo was required to prove a specific implied contractual obligation, breach of that obligation by Ethicon and resulting damage.  It is a principle of black letter law that the covenant of good faith and fair dealing is narrowly construed.  *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1259 (Del. 2004).  When the subject at issue is *expressly* covered by the contract, there cannot be a claim for an *implied* contractual obligation.  In this case, the contract expressly

addressed the duty of confidentiality, particularly Ethicon's duty *not* to utilize confidential

Information in developing a competing product.  In light of the fact that there was an express

contractual provision on this subject and that the express contractual provision was not breached,

there can be no breach of the implied covenant of good faith and fair dealing.

### D.    Fraud Claim

Endo argues that Mr. Shields' testimony at the hearing proves that his October 12, 2011

email – and his subsequent representations to Endo − were fraudulent.  The October 11th email

stated that "the sharing of devices would be covered under our existing NDA."  Yet, Endo argues

that neither Mr. Shields nor anyone else from Ethicon ever told Endo that they deemed the

Endo360° device to be in the public domain.  Endo contends that this is fraud because: (1) Mr.

Shields consistently and carefully conveyed the impression that the devices were confidential

and would be treated as such; and (2) at the time he made those representations, Ethicon

considered the Endo360° to be public.

Ethicon argues that this claim is simply a breach of contract claim parading as a fraud

claim.  Citing *Greenstar, LLC v. Heller*, 934 F.Supp.2d 672, 696 (Del. 2013), Ethicon argues that

a fraud claim based on an alleged breach of contract, rather than a violation of an independent

duty imposed by law, requires a party to sue in contract not in tort.  As the court stated in

*Greenstar*: "[a] breach of contract claim cannot be bootstrapped into a fraud claim merely by

adding the words fraudulently induced or by alleging that the contracting parties never intended

to perform defendant's false representation."  *Id.*  In light of the disputed evidence regarding

whether the Endo360° device was even confidential at all, Endo's fraud claim is, at best, another

way of articulating a claim for breach of contract.  Accordingly, I conclude that the fraud claim

is without merit.

## V.    CONCLUSION

For the foregoing reasons, I find that Endo did not meet its burden of proving misappropriation of trade secrets, breach of contract, fraud, or breach of the implied covenant of good faith and fair dealing.  Accordingly, Endo's claims for damages and equitable relief are denied in their entirety.

Notwithstanding the denial of Endo's claims, I can understand why Endo feels aggrieved as a result of the failed acquisition.  The Endo360° device is an impressive product, brought to market after many years of intensive effort and inventive talent.  Endo's fact witnesses were impressive.  The exemplary efforts of Mr. Meade and Mr. Brecher deserve to be rewarded in the marketplace.  But this is a *legal* dispute, and the issues here are decided on the existing facts and governing law.  The terms of the Secrecy Agreement were clear.  For whatever reason, Endo did not follow the express terms of the Agreement in order to retain the proprietary nature of the technology that it deemed to be confidential.  No court of law or arbitration tribunal can rewrite a contract that the parties voluntarily signed.  Likewise, a party cannot enforce "trade secrets" that it has not protected from public disclosure.  The result in this case follows ineluctably from Endo's failure to properly protect the technology it deemed to be confidential.

## VI.    COSTS

The AAA's costs and arbitrator's fees in this arbitration proceeding shall be divided equally between the parties.  Each party will pay its own attorneys' fees and related costs.

Pursuant to the February 17, 2017 Corrected Order on Motion to Compel, Ethicon is entitled to be reimbursed for its reasonable costs arising from the search for responsive documents submitted for *in camera* inspection relating to Ethicon's Verb robotic device.  Based on the limited number of documents submitted for inspection, any such costs should be *de*

*minimus.* To the extent such nominal costs can be calculated, within 14 days from the date of this Award counsel for Ethicon are directed to submit an invoice to counsel for EndoEvolution itemizing the *reasonable* costs that Ethicon incurred in searching for and producing the foregoing documents for *in camera* inspection. Within 30 days of its receipt of Ethicon's invoice, EndoEvolution is ordered to remit payment of the invoiced amount.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby3 denied.


I, Jane Michaels, do hereby affirm upon my oath as Arbitrator that I am the individual who executed this instrument which is my Award.

Dated this 27th day of June, 2017.

Jane Michaels
Arbitrator


9956725_1